District Judge Benjamin H. Settle

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICK OLMSTEAD, <br>           Plaintiff, <br> v. <br> SECRETARY OF THE NAVY RAY MABUS <br>           Defendant. | No. 3:13-cv-5051-BHS <br><br> DECLARATION OF CHRISTOPHER KAYE |

I, CHRISTOPHER KAYE declare under penalty of perjury, as provided by 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. In 2013 I was the Nuclear Test Nuclear Director for Shop 56. As such I would have been Mr. Olmstead's third-line supervisor in 2013.

2. I am aware that Mr. Olmstead has alleged that his overtime hours were reduced in 2013 in retaliation for his filing a lawsuit in or around January of 2013. Overtime for supervisors at the PSNS/IMF is not managed in the same manner as it may be in other businesses where there is a lot of discretion as to who may or may not be assigned overtime. No-one person is in a position to deny overtime to a supervisor such as Mr. Olmstead. As discussed in more detail below overtime is project specific and if overtime is needed on a project, the overtime automatically would be offered to the supervisor and the crew

Declaration of CHRISTOPHER KAYE
3-13-5051-BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

responsible for the type of work needed. Thus, because I was the person responsible for assigning supervisors such as Mr. Olmstead to his/her specific job assignment, I was loosely the person responsible for the overtime worked.

3. I, however, was unaware until approximately January of 2014, that Mr. Olmstead had filed an employment discrimination lawsuit. I became aware only after I was asked to submit a declaration pertaining to a promotional selection involving Mr. Olmstead and I was then advised by agency counsel that I might be deposed by Mr. Olmstead's lawyers about overtime practices. Accordingly, any decision I made regarding work assignments had nothing to do with the fact that Mr. Olmstead had a lawsuit against the Navy.

4. As the Nuclear Director, I was ultimately responsible for placing Nuclear Qualified First Level Supervisors in a specific job assignment. Each supervisor oversees a crew of skilled workers.

5. During the relevant time period Mr. Olmstead was a temporary Pipe-Fitter Supervisor I. Mr. Olmstead requested to work the swing shift at Bangor and I assigned him to a swing shift position in the Nuclear Pre-Fabrication unit at Bangor. Thus, the overtime worked by Mr. Olmstead was determined by how much demand there is/was in any period for Nuclear Pre-Fabrication work on projects at Bangor on swing shift.

6. The projects at Bangor involve upkeep work on various ships and are usually of short duration. In contrast, Projects at the Shipyard generally involve more extensive work on ships and typically last longer depending on the work scheduled to be executed. In addition to what can be referred to as day to day work maintaining the integrity of specific ships, there is work on projects referred to as DMDs and/or PRVTs that are classified. To explain, without releasing classified information, these are short term overhauls of all systems on particular vessels. Due to the condensed time for DMDs or PRVTs there is

Declaration of CHRISTOPHER KAYE
3-13-5051-BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

often a lot of overtime associated with these projects. Again, however, overtime is not assigned individually on an ad hoc basis but is determined by the specific work needed. If Pre-fab work was needed on swing, it would go to Olmstead's crew.

7. The process for authorizing the funds for overtime is as follows: If overtime is needed on a project (1) the Nuclear Zone Manager (NZM) puts a request into the overtime data base for the hours needed; (2) the Nuclear Assistant Project Superintendent (NAPS) reviews and then approves or disproves the request for overtime hours; (3) the Director/ Project Superintendent reviews and approves/disapproves. The Nuclear Operations Manager, Code 300N2 has the ultimate say as to what is reviewed and approved.

8. If the overtime gets authorized both the NZM and the Shop are notified that overtime has been authorized. With regard to Mr. Olmstead, if overtime has been authorized for nuclear Pre-Fab work at Bangor on swing shift then the NZM would inform Mr. Olmstead that he and his crew were required to come in to work overtime. The overtime would automatically go to Mr, Olmstead as the supervisor of the crew.

9. As stated previously, the overtime goes with the work that is assigned to the project and I have no real discretion to refuse to let a supervisor work overtime with his crew if the overtime had been requested and authorized. The only discretion regarding overtime would come into play if a supervisor did not want to work overtime with his crew and was unable to find a replacement for his/herself. If this occurred, I and/or one of the Second Level Supervisors would ask around and/or examine the weekly volunteer list to determine whether or not other supervisors were willing to fill in. (Some supervisors write their name down on their crew's OT volunteer list (Each Supervisor maintains an OT Volunteer list for their crew) and others do not.).

Declaration of CHRISTOPHER KAYE
3-13-5051-BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10. If multiple supervisors volunteered or wanted to work, and assuming each had the necessary qualifications, in order to choose between specific individuals, the shop would follow a two-step process. Step one, would be to offer the work to a supervisor who is already working on the same project. This individual would already be familiar with the project and with the work that needs to be accomplished, and would have existing relationships with the people/management chains involved. Step two, would be to weigh various factors such as the level of skill necessary to do the job, how technical or difficult the work is, the amount of overtime already accrued, whether the supervisor was butting up against the thirteen day rule (the Shipyard attempts to prevent employees working more than thirteen days in a row whenever possible).

11. If no one volunteers or no one can be convinced to take the shift, I would order someone to work the overtime hours.

12. I have never specifically refused to let Mr. Olmstead work overtime and I am not aware of anyone else refusing to allow Mr. Olmstead to work overtime. If his overtime hours were fewer in 2013 than in 2012, it was simply because there was less work available for which he was qualified.

13. For instance, at Bangor in 2012 there were two DMDs and one PRVT whereas in 2013 there was only one DMD and no PRVTs. The DMD in 2013 lasted from approximately July through September. Mr. Olmstead, however, lost his nuclear qualification in or around August 13, 2013 because he twice failed to pass the nuclear test. As a result, he could not supervise the nuclear work for which he had previously been responsible. This limited him considerably because he was unable to do waterfront work (work on the actual ship). Thus, overtime hours would potentially be impacted. Additionally, starting in or around September of 2013, Mr. Olmstead had medical issues and his doctor

Declaration of CHRISTOPHER KAYE
3-13-5051-BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

limited the work he could do. Finally, the sequestration of the government in 2013 affected the amount of overtime hours available.

14. I would never retaliate against any of my subordinates. In particular, I have no animosity toward Mr. Olmstead. In fact, I have gone out of my way to help Mr. Olmstead. Supervisors can only take the nuclear qualification test three times. If a supervisor fails the test three times, they lose their supervisory status and are demoted to mechanic. After Mr. Olmstead failed the test the first time, I allowed him to attend additional training in the hopes that he would pass the test. After he failed the second time, I asked Mr. Olmstead if he was going to take the test a third time. Because Mr. Olmstead was not sure that he would pass the test if he took it again, and because if he failed it three times I would have to demote him, I offered to transfer him to a non-nuclear supervisory position at the shipyard, thereby allowing him to keep his supervisory pay. Mr. Olmstead accepted the offer.

16. In this new position, Mr. Olmstead has already accrued over 700 hours of overtime. This amount of overtime puts him in the 3rd highest ranking for overtime acquired by a supervisor in Shop/56 in 2014.

DATED December 10, 2014 (Seattle Time)

*/s/ Christopher Kaye*

CHRISTOPHER KAYE

Declaration of CHRISTOPHER KAYE
3-13-5051-BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970